<div align="right">Exeter Bank<br>*vs.*<br>Rogers et al.</div>

---

## The PROPRIETORS OF THE PISCATAQUA BRIDGE *vs.* The NEW-HAMPSHIRE BRIDGE and others.

This court has jurisdiction in chancery of a complaint by the grantees of an exclusive right of building and maintaining a bridge, setting forth that others are attempting to infringe their rights, by the erection of another bridge to their prejudice ; and if the right is clear, may, by injunction, restrain the party from proceeding to erect such bridge.

The existence of a ferry does not render void an act of the legislature granting an exclusive right to erect a bridge within certain limits which include the place where the ferry is situated ;

And the extinguishment of the ferry, afterwards, does not give to the legislature a right to grant another bridge within such limits.

The legislature have power to grant an exclusive right to erect and maintain a bridge within certain limits, and to take tolls.

The grant in such case gives to the grantee a franchise ; and the legislature cannot authorise the erection of another bridge within those limits, without provision for a compensation to the first grantee.

But such franchise is property, and another grant to build a bridge within those limits may afterwards be made, if compensation is provided.

It is not sufficient, however, to authorize the erection of such other bridge, that the first grantee may obtain compensation, by action, for the wrong done in erecting it : no provision for compensation having been made in the second grant.

BILL IN CHANCERY, praying for an injunction to restrain the defendants from erecting a bridge across the Piscataqua river at any place between Nanny's island and Walton's point.

The bill stated, that by a certain statute passed in the year 1793, the plaintiffs were made a corporation, for the purpose of making a bridge over the Piscataqua river, any where between Bloody point and Furbur's ferry inclusively, and to take toll for all persons, horses, carriages, teams, cattle, sheep and swine, passing over said bridge ; and that by the same statute the exclusive right of building and maintaining a bridge across said Piscataqua river, any where between Walton's point, so called, being easterly of Knight's, or Bloody point ferry, and Nanny's island, so called, laying at the bottom of Great bay, above Furbur's ferry, was granted to the plaintiffs ; that by the same statute it was further provided, that a draw or hoist over some one of the channels should be constructed, of such width as the judges of the superior court should direct, not exceeding forty feet, so that vessels might freely pass through the same ; and that if the bridge should not be completed in ten years then the said act of the legislature to be null and void :

That Walton's point is a point on the shore of said river, below Furbur's ferry and below Bloody point ; that Nanny's island is an island in said river, above Furbur's ferry, and above Bloody point, and above Footman's island ; that the whole of said Footman's island, Furbur's ferry and Bloody point are included within the limits of said exclusive right of building and maintaining a bridge ; that the said Piscataqua river, from the mouth thereof to Nanny's island, is a

navigable river and arm of the sea, where the tide ebbs and flows, and navigable for vessels of great burden; and that the part of said river between Nanny's island and Walton's point, and both shores thereof, are wholly within the State of New-Hampshire:

That the plaintiffs were duly organized as a coporation under the said statute, and became justly entitled to all the rights, privileges, franchises and immunities, and subject to all the liabilities, by said statute granted and provided; that within ten years after the passing of said act, relying on the faith thereof, and in consideration of the tolls granted thereby, the plaintiffs, in the year 1794, with great labor and expense, erected a bridge across the river, within the limits by the said act prescribed, from Fox point, in New-ington, to Goat's island, and from that island to the opposite shore in Durham; and made a convenient hoist in said bridge over one of the channels, of the width prescribed by the justices of the superior court, so that vessels might freely pass and repass, and have ever since maintained and kept said bridge in good order, and have received the tolls granted therefor by said act, and still continue in the pos-session and enjoyment of said bridge, and of all tolls, rights and franchises granted by said statute:

That during all the time aforesaid great numbers of pas-sengers with teams, carriages, horses, &c. have been accus-tomed to pass over said bridge, whereby great profits have been received by the plaintiffs, but less than the sums by them expended would justify; that all the towns around are well accommodated and provided for by said bridge, and will continue to pass the same, if the plaintiffs continue to enjoy the said exclusive right granted as aforesaid.

The bill then charges that Arthur Branscomb and others, combining and confederating together with the corporation called the New-Hampshire Bridge, under whose authority they will in any suit at law attempt to justify themselves, and contriving how to injure and oppress the plaintiffs in the

premises, and turn away the travel from the said bridge of the plaintiffs, and bring said travel over a bridge to be erected within the limits of the exclusive right of the plaintiffs, and thereby defraud the plaintiffs of the tolls and profits which would accrue in the premises, and appropriate the same to said New-Hampshire Bridge corporation, deny the said exclusive right of the plaintiffs, and threaten to build another bridge, without the consent of the plaintiffs, across said river at said Furbur's ferry, or at Footman's island, and between said Nanny's island and said Walton's point, and have made preparation for that purpose ; and if not restrained by injunction will cause the same to be built, to the injury and annoyance of the plaintiffs, and in subversion of the rights granted to them as aforesaid :

The bill further charges, that said Branscomb and his associates, combining together as aforesaid, pretend that before and at the time of said grant to the plaintiffs there was a right of ferry across said river at a place called Furbur's ferry, which right has since vested in the said New-Hampshire Bridge corporation, and that by virtue of an act of the legislature, passed January 1, 1833, certain persons therein named and their associates were created a corporation by the name of the New-Hampshire Bridge, and the corporation authorized to build a bridge across the waters between the towns of Newington and Durham, at any place between the southerly part of Footman's island and the northerly part of Furbur's ferry and Crummet's creek—within which limits the said New-Hampshire Bridge corporation and the other confederates aforesaid, set up a pretended right in said corporation to erect and maintain a bridge, by virtue of said act, without the consent of the plaintiffs. And sometimes they pretend that by reason of said right of ferry, or of the same right and the last mentioned act of the legislature together, the said New-Hampshire Bridge corporation has a right to erect a bridge at Furbur's ferry. Whereas the plaintiffs charge and insist that the said waters between

Newington and Durham, at the place in the act last afore-said mentioned, are a part of the said Piscataqua river, and that the same, and the whole of said Footman's island, and of the place called Furbur's ferry, are between Nanny's island and said Walton's point, and within the limits of the said exclusive right of the plaintiffs :

And the plaintiffs further charge and insist, that the said supposed right of ferry at Furbur's ferry, if any ever exist-ed, must be presumed to have been released to the plain-tiffs, inasmuch as no such right had been exercised, or any common ferry kept since the building of the bridge of the plaintiffs, being now nearly forty years ; that in any case said right had never passed to the said New-Hampshire Bridge corporation, and that if it had, it could not be law-fully set up as an authority to build their intended bridge, and to invalidate said exclusive right of the plaintiffs :

And the plaintiffs further insist, that said first mentioned statute created a contract between the State and the plain-tiffs, securing to them the exclusive rights, franchises and privileges therein granted, and that the said franchises, privileges and exclusive rights had become a valuable private property of the plaintiffs, which could not rightfully be taken away, diminished or impaired, without their con-sent or without compensation ; and allege that said supposed act incorporating the New-Hampshire Bridge was passed without the consent and against the remonstrance of the plaintiffs, and contained no provision for any compensation to them ; and that inasmuch and so far as it is repugnant to, and inconsistent with, the said prior grant and contract, and the exclusive right of the plaintiffs, it is contrary to the Constitution of the United States, and void :

All which said actings, doings and pretences of said con-federates, are alleged to be contrary to equity and good conscience, and to the manifest injury and oppression of the plaintiffs.

Wherefore, inasmuch as they have no remedy according

to the course of the common law, to prevent such wrong, and as matters of this nature and the granting of injunctions in such cases, properly belong to the cognizance of this court sitting as a court of equity, they pray that the said confederates may be restrained and prohibited, by injunction, from proceeding in building any bridge across said river, at said place mentioned in said supposed act of the legislature, passed January 1, 1833, or at any place between Nanny's island and Walton's point.

In their answer the defendants admit, that on the 20th June, 1793, a certain statute was passed, entitled "an act " to incorporate certain persons for the purpose of building " a bridge over Piscataqua river, between Bloody point and " Furbur's ferry, so called, and for supporting the same."

They admit, that Walton's point is below Furbur's ferry, and below Bloody point, and that there is an island called Nanny's island, in Great bay, above Bloody point, and above Furbur's ferry, and above Footman's island; but they say that the outlet of said Great bay towards the ocean is the channel of said river at Furbur's ferry, and that said Nanny's island is about one mile and a half above said Furbur's ferry; and that said Footman's island is about one hundred rods above said Furbur's ferry, towards the opposite shore of said bay from said Nanny's island, and nearer to said outlet; and the defendants insist that the bottom of said Great bay as intended by said act, is, according to the true construction thereof, the limit of said pretended exclusive grant, and that inasmuch as the bottom of the bay must be understood to be at or near said outlet, at said Furbur's ferry, below said Footman's island, they insist that said Footman's island is not within the limits of said exclusive grant:

They admit that the Piscataqua river is a navigable river and arm of the sea, where the tide ebbs and flows from the mouth thereof to Nanny's island, and that the part of the river and bay between said Nanny's island and said Walton's

point, and both the shores thereof, are wholly within this State :

The defendants further admit, that the plaintiffs accepted the said statute passed the 20th June, 1793, and if said act were constitutional and valid, became organized as a corporation under it, and entitled to all the rights, privileges, immunities and franchises, and subject to all the liabilities which said statute legally conferred or imposed :

The defendants further admit, that within ten years after the passing of said statute, the plaintiffs, at great expense, built a bridge across said river within the limits in the same statute prescribed, from Fox point to Goat island, and from said island to the opposite shore in Durham, and constructed a convenient hoist, as they have alleged, and have kept said bridge in good order, and have remained in the possession and enjoyment of said bridge and tolls, rights and franchises, as set forth in their bill :

They also admit, that during all the time aforesaid there has been much travel over said bridge, whereby great profits have accrued to the plaintiffs ; but they deny that the towns around are well accommodated and provided for by said bridge.

The defendants further answer and say, that public convenience and accommodation require a new bridge, from Newington across to the opposite shore, at or near Furbur's ferry or Footman's island ; that a petition, signed by a great number of citizens, was presented to the legislature in June, 1831, praying for a grant of a right to construct a bridge at or near said place, and an act of incorporation for that purpose ; that a hearing upon the said petition was ordered and had ; that the plaintiffs appeared and were fully heard on the same petition ; and thereupon the legislature passed an act on the 1st January, 1833, entitled " an act to incorpo-" rate a company by the name of the New-Hampshire " Bridge," and therein authorized the persons therein named,

and their associates, to erect and maintain a bridge across the waters between Newington and Durham, at any place between the southerly part of Footman's island, and the northerly part of Furbur's ferry and Crummett's creek :

They further say, that the last mentioned act has been accepted and a corporation organized under it :

The defendants further allege, that at the time the proprietors of the Piscataqua bridge were incorporated, and a long time before, a right of ferry across said river or bay, at Furbur's ferry, was vested in one Levi Furbur, and that the same was in no wise transferred to the plaintiffs, nor was any compensation made to the owners of said ferry ; that by reason of the erection of said Piscataqua bridge said right of ferry was so reduced in value that said Furbur ceased to exercise his right, whereby it reverted to the State, and remained vested in the State until the same was granted to said New-Hampshire Bridge by the act aforesaid :

They deny that the plaintiffs, by the act of 1793, or by the exercises of any right or claim under the same, have acquired any exclusive right of erecting a bridge at said Furbur's ferry, or any right to said ferry :

They allege, that the place where the plaintiffs erected their bridge is more than two miles below Furbur's ferry and Footman's island ;—that the lands owned by the plaintiffs do not extend to those places, or within two miles of either of them ; and deny that the plaintiffs have acquired any exclusive right beyond the limits occupied by their bridge :

They further allege, that the grant to the plaintiffs was made without the consent of the said Levi Furbur ;—that the same contains no provision for any compensation to him for damages sustained in the premises ;—that it is unconstitutional and void, and that no contract is created by the same with the plaintiffs :

They admit, that the act incorporating the New-Hampshire Bridge was passed against the remonstrance of the plaintiffs, but deny that it impairs any contract with the

plaintiffs, or that any right or property of the plaintiffs has been taken or appropriated to the public use, or to the use of the defendants, by means of said act:

And they insist, that the common law will afford a plain and adequate remedy, if any injury is sustained by the plaintiffs, and deny the jurisdiction of this court as a court of chancery.

The replication and rejoinder respectively re-affirm the truth of the matters contained in the bill and answer.

The cause was heard at this term, when it appeared that the charter under which the plaintiffs were organized was entitled "an act to incorporate certain persons for the pur- " pose of building a bridge over Piscataqua river, between " Bloody point and Furbur's ferry, so called, and for support- " ing the same."

The preamble recited, that " a bridge over said river, at the place above named, would be of public utility," and that certain persons named had petitioned for liberty to build the same, and to be incorporated for that purpose.

The first section constituted them and their associates, who are or shall become proprietors in said bridge, a corpo- ration and body politic " for the purpose aforesaid," by the name of the Proprietors of Piscataqua Bridge.

The second section provided for calling the first meeting, and authorized the corporation to establish rules and by- laws " for the government of said corporation, for carrying into effect the purpose aforesaid," and for collecting the tolls granted by the act.

The third enacted, that the proprietors aforesaid be " per- " mitted and allowed to erect a bridge over Piscataqua river " at the place aforesaid, viz., any where between Bloody " point and Furbur's ferry inclusively," and empowered them to purchase any lands adjoining said bridge, and to hold the same in fee simple.

The fourth, for the purpose of reimbursing said proprietors the money by them expended in building and supporting said bridge, granted and established a rate of toll.

The fifth, " in order to carry into effect said undertaking," granted and vested in " the proprietors of Piscataqua bridge aforesaid" all the right of the State in and unto Goat island.

The sixth enacted " that the exclusive right of building " and maintaining a bridge across said Piscataqua river, any " where between Walton's point, so called, being easterly " of Knight's, or Bloody point ferry, and Nanny's island, so " called, laying at the bottom of Great bay, above Furbur's " ferry, be and the same is fully granted to said petitioners, " and such as are or may be associated with them and become " proprietors, their heirs and assigns." This act passed June 20, 1793.

The act incorporating The New-Hampshire Bridge was passed January 1, 1833, and authorized the corporation to erect, build and maintain a bridge across the waters between the towns of Newington and Durham, at any place between the southerly part of Footman's island and the northerly part of Furbur's ferry and Crummett's creek ; and empowered the corporation to purchase and hold in fee simple any lands necessary for erecting and maintaining said bridge between the places aforesaid.

It was further in evidence, that the Piscataqua bridge was erected as early as the year 1794, between the towns of Newington and Durham—that the place called Bloody point is on the Newington shore of said river, below said bridge—that Walton's point is easterly of Bloody point, and farther down towards the mouth of said river—that the place called Furbur's ferry is farther up said river, and above said bridge, and within three miles of the same—that Footman's island is south of Furbur's ferry, and Nanny's island still south of that—that said river at Nanny's island, Footman's island, Furbur's ferry, and for some distance below runs

in a northerly direction, and then, turning eastwardly and southeastwardly, runs by Piscataqua bridge, Bloody point and Walton's point—that the waters between the towns of Newington and Durham, including the whole of Footman's island, Furbur's ferry, Piscataqua bridge and Bloody point are, according to the course of said river, between Nanny's island and Walton's point—and that a new bridge, over said river, within said limits, would be a great injury to the plaintiffs, and perhaps so diminish their tolls that they would be insufficient to secure the maintenance of the bridge.

It was conceded, that the place where the defendants proposed to erect their bridge was within the limits stated in the sixth section of the plaintiffs' charter, but not within the limits set forth in the title, preamble, and third section.

*Cutts* and *Freeman*, for the plaintiffs. Neither the title, preamble, or third section of the act of 1793 recite the exclusive grant ; and the title of an act is not part of the act, and is not to aid in its construction. 7 *Pick.* 455.

The *termini* of the exclusive grant were well known. It embraced three ferry places—one at Bloody point, another at Fox point, where the plaintiffs' bridge is erected, and Furbur's, about two miles to the southwest.

The exclusive grant was intended to be as extensive as stated in the sixth section.

This grant constituted a contract between the State and the grantees. The grantees took a beneficial interest. 6 *Cranch* 87, *Fletcher* vs. *Peck ;* 7 *do.* 164, *New-Jersey* vs. *Wilson ;* 9 *do.* 49, *Terrett* vs. *Taylor ;* 4 *Wheaton* 460, *Dartmouth College* vs. *Woodward ;* 9 *do.* 1, *Gibbons* vs. *Ogden ;* 2 *Mass.* 143, *Wales* vs. *Stetson ;* 7 *Pick.* 403, *Proprietors of Charles River Bridge* vs. *Warren Bridge.*

Grants are to be taken most strongly against the grantor, and where a grant by a sovereign power is upon a valuable consideration the same rule applies. 7 *Pick.* 487.

We do not admit that Furbur ever abandoned his ferry,

or that he ever had one legally. If he had, an owner of a ferry has no right to build a bridge.

If Furbur ever had a right, he has it still, or it is extinct.

The State cannot avoid their grant by saying that no compensation was provided for Furbur. If Furbur was damnified he had his remedy. 2 *Dane's Abr.* 686, *Chadwick* vs. *Proprietors of Haverhill Bridge.*

The plaintiffs' charter was not unconstitutional for that reason, and if it had been the defendants cannot take advantage of it in this mode.

Undertaking to assert a right over what has been already granted, is impairing the contract.

It is alleged that we may have a remedy at law, but this is wholly incomplete. In order to avail ourselves of it we must keep persons to watch and note the numbers who pass over the defendants' bridge ; and then it must be left to conjecture whether they would have passed over the plaintiffs' bridge if the other had not been built.

This may be compared to injunctions to restrain the sale of books. 1 *Maddock's Ch.* 124 ; 8 *Ves.* 222 ; 17 *Ves.* 422.

The statute authorizes issuing injunctions to prevent injustice, and the court may prevent the erection of a nuisance, as that prevents injustice. 2 *Harrison's Ch.* 199 ; 1 *Maddock* 127.

Stating an interest account and crediting the tolls, shares in the plaintiffs' bridge ought to sell for more than $1100. They will not now probably sell for $50 ; and if the defendants' bridge is erected they must be worthless.

*Bartlett* and *Stickney*, for the defendants. The matter before the court is of deep interest—as to the rights of the parties upon the record—as it bears on a great public question of public rights, and as a new proceeding under our laws.

Several questions arise upon the facts which the bill and answer state and admit :

I. Is our grant within the limits of the grant to the Piscataqua bridge corporation, upon a fair interpretation of their charter?

II. Had the legislature the power to make such an act as shall prohibit all future legislatures from providing for the necessities or convenience of the public in all after time?

III. Did the grant to the plaintiffs in this particular case conform to the constitutional requisites?

IV. Is it a grant of such property or interest that our grant would be a violation either of the constitution of this State or of the United States?

V. Can a proceeding in chancery be sustained in this case?

1. Is our grant within the limits of the plaintiffs' grant, upon a fair interpretation of their charter?

The title of their charter is " an act to incorporate certain " persons for the purpose of building a bridge over Piscata- " qua river, between Bloody point and Furbur's ferry, so " called, and for supporting the same."

The preamble is: " Whereas a bridge over said river, *at* " *the place above named*, will be of public utility, and " whereas Edward St. Loe Livermore" &c. "have peti- " tioned the general court for *liberty* to build the same, and " to be incorporated for that purpose."

The first section makes the petitioners a corporation and body politic *for the purposes aforesaid.*

The second section provides for adopting such by-laws as to them shall seem necessary and convenient for the regulation and government of said corporation, for carrying into effect *the purpose aforesaid.*

The third section permits and allows the proprietors " to " erect a bridge over Piscataqua river, *at the place aforesaid,* " *viz. any where between said Bloody point and Furbur's* " *ferry inclusively*," and to purchase and hold lands adjoining the same.

The fourth section provides, " that for the purpose of re- " imbursing the said proprietors the money by them expend- " ed in building and supporting *said bridge*, a toll be and " hereby is granted," &c.

The fifth section sets forth, that " said proprietors have " petitioned for a grant of the island called Goat island ; and " it appearing necessary, in order to carry into effect *said* " *undertaking*, that said grant be made," &c. " the same " hereby is granted and vested in the proprietors of *Piscata-* " *qua Bridge aforesaid*."

The sixth section enacts, that the exclusive right of building and maintaining a bridge across said Piscataqua river, any where between Walton's point, so called, being easterly of Knight's or Bloody point ferry, and Nanny's island, so called, lying at the bottom of Great bay, above Furbur's ferry, be and the same is fully granted to said petitioners, and such as are or may be associated with them and become proprietors, their heirs and assigns.

These facts then appear by this charter :

1. It was granted at the suit of the grantees.

2. That all they sued for was *liberty* to build and support a bridge across the river between Bloody point and Furbur's ferry, and a grant of Goat island.

3. That the title of the bill gives the limits of Bloody point and Furbur's ferry.

4. That the preamble of the bill gives the same limits— " *the place above named*."

5. That they are made a corporation for the *purpose aforesaid ;* that is, to build a bridge within those limits, and no where else.

6. That they are authorized to adopt measures for *the purpose aforesaid*.

7. That their permission to build a bridge is in express terms—" *at the place aforesaid, viz. any where between Bloody point and Furbur's ferry inclusively*" *;* and that

they have authority to purchase and hold lands adjoining *said bridge*—that is, a bridge built within those limits.

8. That the tolls are granted for building *said bridge*.

9. That Goat island is granted as necessary to carry into effect *said undertaking*.

And then, and not till then, comes the pretended enactment to *exclude* others from building within a mile of their limits one way, and half a mile the other.

As to the rule by which such grants are to be construed, it is the reverse of the general principle as laid down by the plaintiffs. They are not to be construed most favorably to the grantee.

A grant made *at the suit* of the grantee, shall be holden most beneficially against the grantee. 2 *Black. Com.* 347,

In the language of Morton, J. " Exclusive rights are not " to be presumed to have been granted further than the ex- " press words of the grant will warrant." They are not to be extended by implication. 7 *Pick.* 464; *Bac. Abr. Prerogative, F.* 2; 3 *D. & E.* 288, *and other cases cited ;* 7 *Pick.* 461.

It is objected, that the title and preamble of a bill may not be consulted in the construction of the act. A few *dicta* to that effect are found in English authors, but the number and weight is on the side of common sense—the other way. *Co. Litt.* 79, a ; 13 *Ves.* 36, *Mason* vs. *Armitage ;* 6 *Dane's Abr.* 588 ; 2 *Chitty's Eq. Dig.* 1243 ; 1 *Ves.* 365, *Ryal* vs. *Rolles,* where an expression of Cowper against the doctrine " that the preamble of an act is proper to explain the general body of it," is expressly disapproved.

But the enacting parts may by reference, make both preamble and title parts of the act, and have in this case. The whole is founded on the description in the title.

Was it the intention, then, to give the plaintiffs any rights above Furbur's ferry ? They asked for none above. The preamble represents no claim above. The corporation is

thus limited in the first, second and third sections.   What then is granted above Furbur's ferry ?—the right of the dog in the manger.

Could the legislature have intended to grant what was not asked ? and, as the plaintiffs have no right of toll there, is the prohibition of others a *franchise* ?

General words in a statute may be restrained in their meaning, if there be in the statute some ground of restriction, by reasonable construction.   17 *Ves.* 91 ; 1 *Kent's Com.* 461, 2 ; 14 *Petersdorff's Abr. 575, and cases cited.*

If the legislature misunderstood, or the king is deceived in his grant, it is a void grant.   Could this sixth section have existed upon any other ground—so contradictory to every other clause in the act ?   3 *D. & E.* 246, *Rex* vs. *Pasmore, and cases cited.*

If, then, their charter, fairly construed, is limited at Furbur's ferry, the plaintiffs' complaint is not supported.

Does the pretended *exclusive* right extend to their whole limits, wherever they may be ?

The plaintiffs' charter gives the exclusive right of building and maintaining a bridge *any where* between certain limits.   Does this give a right of building a bridge *every where* between those limits ?

The *exclusiveness* is as extensive as the right of erecting. Now if they may cover the whole six miles with a bridge, or bridges, then their *exclusive* right is as broad.   But if they can build but one bridge, and may choose any point in that distance, when their bridge is located their exclusive right is located, and confined to it.

Suppose the charter had contained no provision of forfeiture, and the same words of grant ;—that it was accepted, but the bridge never built—would this exclusive right have covered the whole distance ?

The limits are referred to in order to fix the location, not to define rights.

2. Had the legislature power to make such an act as shall prohibit all future legislatures from providing for the necessities or convenience of the public in all after time ?

The question that the public convenience and necessity require the New-Hampshire Bridge is settled by the grant itself. The legislature alone is the tribunal to adjudicate upon that subject.

It is necessary—the public good requires it ;—but the plaintiffs say the public good cannot be accommodated, because they have monopolized the right—their private interest stands in the way—a former legislature have given away the public welfare for their private benefit.

Has the legislature of 1793 thus bound—could they thus bind—all future legislatures ?

Suppose the legislature of 1835 should be of opinion that manufacturing establishments are injurious—that rail-roads are an evil—that banks are a nuisance : They have only to incorporate a company with power to run five or ten spindles, and the exclusive right of manufacturing through the State—or a short rail-road—or a bank with a small capital, with like exclusive rights, and all further grants are forever precluded. Can such a principle be sanctioned ?

For further reasoning upon this point we refer to the opinion of Mr. Taney, attorney general of the United States, on the validity of the law of New-Jersey, incorporating the Camden and Amboy rail-road, published in Niles' Register, November 2, 1833.

All government is instituted for the general good. *Bill of Rights—Art.* 1.

3. Did the grant to the plaintiffs, in this particular case, conform to the constitutional requisites ?

Whether it did or not, the plaintiffs say we may not object. But this is not so. If it did not it is void.

The legislature have given us a grant. The plaintiffs set up their charter in opposition. If that charter is void is our *legal* right barred by it ?

If their grant covers Furbur's ferry, a private right was taken, and no compensation made.

We assert in our answer that such a right existed. It is not denied in the replication. It is admitted, otherwise there should have been an issue for proof.

But they say that does not make their grant void, but gave a right of action to Furbur.

We agree to such law. The plaintiffs' remedy is by a suit at law.

4. Is it a grant of such property or interest that our grant would be a violation either of the constitution of this State or of the United States?

What is granted to them? Corporate rights—a certain tract of land—power to build a bridge—a right to exact tolls—and the right to prohibit any other person from building a bridge, not on their own land, but somewhere else.

What right does our grant assume? Not their corporate rights—they still have them. Not their land. Not their power to maintain a bridge. Not their right to take tolls. But it gives a right, elsewhere, to build a bridge called for by the public convenience.

Now what bearing have cases like Terrett vs. Taylor, Fletcher vs. Peck, and Dartmouth College vs. Woodward, upon such a question?

In those cases lands were taken, corporate powers resumed, rights meddled with admitted to be vested, and to be franchises.

The only pretended right here, is a promise not to give *liberty* to others to build a bridge: a power the legislature could not divest their successors of; if a contract—one they could not make. But it is not a contract in any sense. At all events, it must be subject to the *implied* condition of yielding to public necessity and convenience.

If it be *property*, the plaintiffs' title is not more perfect than that of individuals to theirs—or the plaintiffs' title to other property not acquired from the State.

Private property may not be taken for public use without compensation. It may, then, with.

Do not the legislature authorize your lands to be taken for ways, &c. ? If you hold your lands by grant from the State, is that title more sacred, and would that stop the road committee ?

But no compensation is provided here. That does not make the grant void, but gives an action. *Chadwick* vs. *Haverhill Bridge*, cited for plaintiffs.

5. Can a proceeding in chancery be sustained in this case ?

There is a clear and manifest remedy at law. This is not denied. *Chadwick* vs. *Haverhill Bridge*. So are the English cases.

Chancery cannot relieve against a statute. 2 *Chitty Eq. Dig.* 1242, 3.

*Cushman* and *Clagett*, on the same side.

*Freeman*, in reply. Neither the title or preamble of an act shall in general control the enacting clause, unless expressly referred to, and made part of it. 1 *W. Black.* 95 ; *Kent's Com.* 430. There is no such reference in the sixth section. This section is not inconsistent with what precedes it. The whole is affirmative.

If this is a mere grant of exclusion it is well enough. It is necessary to have the exclusive right to secure revenue enough to maintain the bridge ; and the allusion to the dog in the manger, therefore, is not applicable.

The words of the sixth section are clear and explicit. There is no room for construction, and the argument that the construction should be most strongly against the grantees may be laid out of the case. But we deny the rule. The construction should be like that of any other contract.

The doctrine that the king may be deceived does not apply to the legislature. The king may be a minor ; and other reasons exist for a difference in this respect.

Here is no ground for any supposition of deceit.

There was in this case a good consideration—a reasonable compensation on the part of the plaintiffs. The case is like a sale of stock in trade, and a covenant not to exercise business within certain limits. 1 *Chitty's Eq. Dig.* 480.

This power of granting exclusive rights has always been exercised. It has been done repeatedly in relation to bridges, ferries and steam-boats. The legislature has power over public rights, and may, by grant, in some measure restrain the public for the public good. They have the right to bind the public, unless restricted by the constitution.

In Charles River Bridge vs. Warren Bridge, the court were unanimous, that if limits had been assigned the grant would have extended to them, and have been valid.

As to Furbur's right of ferry, there are no facts in the case to raise a question whether the grant to the plaintiffs was unconstitutional on that account.

Furbur could claim no damage for building a bridge beyond his limits. There were three ferries, and the bridge was built, not at Furbur's ferry, but at the place where one of the others was situated.

Furbur's right, then, could not extend to the place where the plaintiffs' bridge was erected.

It does not appear what his rights were; but they could not be affected by building a bridge at the other ferry.

A ferry right and a bridge right are different things—and our grant of a bridge is good against all who had not a prior right to build a bridge—and good against the grantor, and all subsequent grantees.

It was certainly no injury to Furbur to exclude persons from building a bridge over his ferry. He could not build one himself without a grant for that purpose.

The grant to the defendants to be a corporation is well enough. They may build a bridge if it is lawful. They may purchase a right so to do, or build by license. 7 *Pick.* 444, *per Morton, J.*

The objection to the chancery jurisdiction cannot avail. Chitty cites *Hobart's Rep.* 243, where it was held that the court could not relieve against the statute *de donis*, and make a common recovery a bargain and sale.

Our statute is broad enough to include this case. No writ of prevention lies at common law.

PARKER J. delivered the opinion of the court. The answer in this case closes with a denial of the jurisdiction of this court as a court of chancery, because the plaintiffs, if they sustain any injury may have adequate remedy at the common law.

It would, perhaps, be the better practice to consider any objection of this character before a hearing upon the merits, even if it is not taken by a formal demurrer. *2 Johns. C. R.* 369, *Underhill* vs. *Van Cortlandt;* 2 *Caines' Cas. in Error* 40, 56, *Ludlow* vs. *Simond.*

The counsel, however, have placed no great reliance upon this exception, and it is very clear that it cannot be maintained.

The bill alleges that the defendants are about to erect a bridge at a certain place, within the limits of an exclusive grant to the plaintiffs—that they attempt to do this under a pretended right of an authority from the legislature of this State—that this is in violation of a prior grant from the State to the plaintiffs—that no compensation has been provided for them—that the erection of such bridge will be a great injury to them—and that they have no remedy at the common law to prevent such wrong.

If this be so, it must be apparent that the erection of a bridge by the defendants will operate as a great injustice upon the plaintiffs, and the case would be within the express power given to this court, by statute, to grant writs of injunction whenever the same shall be necessary to prevent injustice.

If the defendants have no right, and proceed to erect a bridge, the plaintiffs may be without any adequate remedy;

for upon a judgment at common law, for damages, against the New-Hampshire Bridge corporation, all the corporate property, being perhaps the bridge so erected, might be wholly insufficient to indemnify the plaintiffs for the invasion of their rights. The bridge might be to them useless, and of no value. The individuals concerned in its erection might be able to respond, and still the remedy be inadequate, as it might be difficult to ascertain the measure of the injury sustained.

An injunction is the appropriate remedy, if the right is clear. 1 *Ves. sen'r* 188, *Hughes* vs. *Trustees of Morden College;* 1 *Johns. C. R.* 611, *Croton Turnpike Company* vs. *Ryder;* 2 *ditto* 162, *Gardner* vs. *Village of Newburgh;* 5 *ditto* 101, *Newburgh Turnpike Company* vs. *Miller;* 7 *ditto* 334, *Jerome* vs. *Ross;* 9 *Johns. R.* 507, *Livingston* vs. *Van Ingen.*

The answer admits, that the defendants are about to erect a bridge at the place specified, and claims a right so to do under the authority of the legislature; and we must therefore proceed to enquire whether its erection will infringe the rights of the plaintiffs, and be the means of such injustice to them as should be prevented by a writ of injunction.

It is objected, on the part of the defendants, that the charter of the plaintiffs does not give them such limits that the erection of the proposed bridge, by the defendants, will interfere with their exclusive rights.

It is said that by the terms of their charter the plaintiffs had no right to build a bridge any where except between Bloody point and Furbur's ferry, and that, taking the title of the act together with the sections cited, all the exclusive right of the plaintiffs, if they have any beyond the place occupied by their bridge, must be limited to Bloody point on the one hand, and Furbur's ferry on the other—that if they have any claim of right above Furbur's ferry, it can be only a right to preclude others from building a bridge, not to build one themselves—that this cannot be a franchise—and that their exclusive limits cannot extend beyond the limits

in which they might erect a bridge. And if this be the true construction of the plaintiffs' rights, the defendants allege that they can accomplish all they are attempting to do without any violation of the rights or franchises of the plaintiffs.

But we cannot restrict the grant to the plaintiffs by the title and preamble of the act. If we find within the body of the act an express and unequivocal grant of powers and rights not mentioned in the title or preamble, we cannot restrict the grant of those rights merely because the terms of such grant are more extensive than the terms of the title and preamble. *7 Pick.* 455.

If the title had been an act to incorporate certain persons for the purpose of building a bridge at Fox point, the place where the plaintiffs erected their bridge, and the act itself granted to the corporation in explicit terms the right to build between Walton's point and Nanny's island, the grant could not be construed to be of the right mentioned in the title alone.

The sixth section of the plaintiffs' charter gave them, in terms, the exclusive right of building and maintaining a bridge across the Piscataqua river, any where between Walton's point and Nanny's island; and there is, in this section, no reference to any other part of the charter by which this grant of power and right is to be restricted.

On the supposition that by the charter the plaintiffs were obliged to erect their bridge within the limits between Bloody point and Furbur's ferry, as specified in the third section, we see no reason, if the legislature may grant exclusive rights, to doubt their power to grant to the plaintiffs exclusive limits, connected with the grant of their bridge, even beyond the limits in which their bridge must be erected.

Such right of exclusion might be essentially necessary to ensure the erection and maintenance of the bridge, notwithstanding the bridge itself might be required to be erected

within smaller limits, or at a definite place—and if so it was competent for the legislature to make such a grant, attached to the grant of the bridge, if they might lawfully grant any exclusive limits.

It might perhaps admit of question whether the sixth section did not give the plaintiffs power to erect their bridge any where within the exclusive limits designated in that section; but this is not material to the present case.

It is farther contended, that the plaintiffs' charter gave them only the exclusive right of selecting a site for their bridge within certain limits, and that having made their selection and erected their bridge, the place of erection becomes thenceforth the only exclusive right which they can claim under their charter.

But we cannot adopt this construction of the grant, not only because such are not the terms in which the grant is made, but because it is apparent that such construction would defeat the object which must have been in contemplation in procuring and making the grant of an exclusive right.

The charter of the plaintiffs, then, confers upon them by its terms the exclusive right of building and maintaining a bridge between Walton's point and Nanny's island; and it is conceded that these limits cover the whole ground upon which the defendants claim a right to erect their bridge.

The next question is, whether this was a constitutional and valid grant.

The answer alleges, that at the time of this grant, one Levi Furbur had a right of ferry within those limits—that no compensation was provided for Furbur, and that the grant is unconstitutional and void.

That Furbur was in the occupation of a ferry at the time of the grant to the plaintiffs, which was within the exclusive limits granted to them, seems to be conceded. What his right was, or how it originated, does not appear.

There is nothing to show that his ferry was not set up by him without any authority.

On the supposition that he occupied under a grant, it is not to be inferred of course that the grant extended beyond the place he occupied.

If Furbur had had the grant of a ferry, generally, we should pause before holding that the legislature could not grant a bridge, or even another ferry, so near as to be consequentially injurious to him. Upon this subject different opinions have been entertained; and it may well be questioned whether the grantee of a ferry, or of a right to erect and maintain a bridge at a particular place, without any terms of exclusion in the grant, can set up that right in avoidance of any other grant which is not directly injurious in its operation, but injurious merely in its remote consequences by diverting travel and tolls. 1 *Pick.* 432, *Callender* vs. *Marsh.*

It would seem to have been the understanding, in this State at least, that if the party intended to secure himself from competition of this character he must obtain a provision to that effect in his grant; and if no such provision is found, it may well be held that the grant was taken with a reliance on the wisdom and discretion of the legislature to protect the grantee from injurious competition, by refusing to authorize any other enterprise of a similar character in the immediate vicinity, unless required by an imperious necessity; and with an assent, on the part of the grantee, that whenever the legislature should deem it expedient, they might make other grants, remotely affecting the former, so long as the right and privilege conferred by the terms of the grant were not infringed.

But it is not important to settle that question here.

If it was shown that Furbur had an exclusive right of ferry within certain limits, we are not prepared to hold that the legislature might not lawfully grant a right to erect a bridge within those limits, if the *locus in quo* occupied by

him for his ferry was not taken, and he was left to the enjoyment of an exclusive right of ferry as before.

The erection of a bridge near his ferry might be consequentially injurious to him. It might deprive him of the profits of his ferry; and yet if his right of ferry was not infringed, how could the act be held to be unconstitutional?

The grant of an exclusive right of ferry is certainly not an exclusive right of all modes of transportation and conveyance.

Whatever Furbur's rights may have been, he does not appear to have complained of the erection of the plaintiffs' bridge; and whether they purchased his consent, or he abandoned his ferry without, the defendants are in no way connected with him, nor would the State, by an extinguishment of his right of ferry, gain a right to grant a bridge within the exclusive limits for a bridge already granted to the plaintiffs; although the legislature might perhaps for that reason grant another ferry at the same place.

It is further contended, that the legislature which granted the charter of the plaintiffs' had no power to grant such an exclusive right, and that the act, therefore, so far as it purports to give exclusive limits, is void.

By the constitution of this State, full power and authority are given and granted to the general court " from time to " time to make, ordain and establish all manner of whole- " some and reasonable orders, laws, statutes, ordinances, " directions and instructions, either with penalties or without, " so as the same be not repugnant or contrary to this consti- " tution, as they may judge for the benefit and welfare of " the State," &c. *N. H. Laws* 7.

There is certainly no express provision of the constitution authorizing, in so many words, a grant of this character. It is equally certain that there is no express prohibition of such an act. " When," says Chief Justice Kent, " the " people erect a single entire government they grant at once " all the rights of sovereignty. The powers granted are

"indefinite, and incapable of enumeration.   Every thing is
"granted that is not expressly reserved in the constitutional
"charter, or necessarily retained as inherent in the people."
—9 *Johns.* 574, *Livingston* vs. *Van Ingen.*

It will not be necessary to resort to any principle so broad
as this to show that the legislature may make a grant of
this character.

The constitution no where gives the legislature, in terms,
the power to make a grant of land, or a charter of incorpo-
ration, or to confer a right to make bridges, turnpikes or
canals; but such power has always been exercised, and no
one doubts the right to make such grants.   6 *Cranch* 128,
*Fletcher* vs. *Peck.*

If this is conceded, the legislature may certainly make
exclusive grants.

They may grant land in fee simple, and the grantee will
have an exclusive right.   "*Cujus est solum ejus est usque
ad cælum, et ad inferos*"—and he has this to him, and his
heirs and assigns forever.   Nothing can well be imagined
more exclusive than this.

They may grant a bridge across a navigable river.   No
one can justify such erection without a grant.   But such
grant is necessarily exclusive to a certain extent.   So far as
the structure itself extends, so far the right must be exclu-
sive.   No one will contend that a subsequent legislature
could regard such grant as void, and for that reason authorize
the building of another upon the same foundation, or one
which should occupy a part of the space already in the pos-
session of the grantee.

The legislature, then, has power to grant a right to build
and maintain a bridge; and the right will be exclusive to
the extent occupied by the bridge, which may be of greater
or less dimensions, according to the grant.

What limits the power of the legislature to the positions
occupied by the wood and stone used in the construction of
the work?

If the legislature may grant a right which will be exclusive to the extent of forty feet, or sixty feet, at what number of feet or rods shall we fix the limits of the power, so that all beyond is void?

If it be necessary, in order to effect the object, that the grant should be exclusive to the usual width of a bridge, it may be equally necessary to the accomplishment of the purpose, that the limits should be still more extensive. It may be necessary to lay the foundations much broader. It may be necessary to erect works above and below for the preservation of the structure.

If the legislature may grant the right to build the bridge, and may grant exclusive power over space sufficient for its erection, because otherwise the grant could not be carried into effect; why may they not grant such power over space sufficient in other respects to ensure its erection? Why may they not make a grant of such extent that the grantees will think the prospect of remuneration sufficient to induce them to undertake the work?

Again, the legislature may undoubtedly grant with reference to the preservation of the bridge. Such is one of the objects in granting a toll. If they may grant powers and rights with a view to preserve it from floods, by the erection of works of security above or below; and if they may grant tolls in order to preserve it from decay, why may they not extend the exclusive right so far that these tolls will furnish adequate means for keeping it in repair?

It is not our province to judge how extensive the grant to the plaintiffs ought to have been. It was said in the argument, that the necessity of the act authorizing the defendants to erect a bridge, is conclusively proved by the grant itself—that the court are not to enquire into that necessity. And so of the plaintiffs' exclusive limits;—the necessity of their extent in order to effect the object, was for the consideration of the legislature and not for us.

Charters with exclusive privileges have been repeatedly granted, here and elsewhere. 9 *Wheat.* 97, *note a.* They have been deemed necessary to the promotion of enterprises of public utility, and have in many instances operated greatly to the convenience of the community, as the means of accomplishing public improvements which would not otherwise have been undertaken, or must have been delayed to a much later period.

The right to make such exclusive grants has been supported by some of the most eminent counsel in the United States, and has not been contested by others who would not have failed to deny it had it been deemed of a questionable character. It has received the sanction of some of the most learned tribunals in the Union, and we see no reason to doubt the soundness of the principle. 7 *Pick.* 393, 440, 448, 456, 465, 473, 476, 492, 519, *Proprietors of Charles River Bridge* vs. *Warren Bridge ;* 9 *Johns.* 525, 551, 559, 563, 573, 584, *Livingston* vs. *Van Ingen ;* 4 *Johns. C. R.* 150, *Ogden* vs. *Gibbons ;* 17 *Johns.* 488 ; 9 *Wheat.* 74, 143, *Gibbons* vs. *Ogden.*

It has not been contended that there is any thing in the provision of the constitution of the United States authorizing Congress to regulate commerce, or in any act of Congress which militates, in any degree, with the power of granting an exclusive right of building a bridge within the territory of a State, and there seems to be no ground for any such supposition. 9 *Wheat.* 19, 203, 235 ; 3 *Cowen* 733, 754, *North River Steam Boat Co.* vs. *Livingston ;* 11 *Wendell* 590, *The People* vs. *Babcock ;* 2 *Peters' S. C. R.* 245.

It has been urged in the argument, that if the legislature may grant exclusive rights of this character, a legislature opposed to manufactures, to internal improvements, or to banking, might grant a small cotton factory, with the exclusive right of manufacturing within the State—or a short

rail-road—or a single bank—with exclusive privileges, and the public thus suffer great injury.

It will be in time to consider whether grants of such a character are within the constitutional exercise of the legislative power, and whether they may or may not be avoided, when a case is presented to us in which it is apparent that a fraud must have been practised in obtaining the grant, or the circumstances under which it was made show that it was merely colourable, and intended to effect other purposes than those which appear upon the face of it.

There is nothing in this case to lead to a supposition that this grant was not fairly obtained—that the public good did not require a grant of the powers and rights contained in the charter—or that the consideration on the part of the grantees, in providing a great public highway for the convenience of the citizens, was not fully adequate to all the rights and privileges they received. It appears that the grantees did not overreach the legislature. The enterprise was one of great public utility ; and while the community have had all the benefit which was contemplated from the grant, the grantees, it is not denied, were subjected to great loss—the expenditure far exceeding the estimates.

Cases may exist where, owing to a change in the population, business, and intercourse of the country, the public interest may require the opening of new avenues within the limits of such exclusive grants, and in which the individual right should be made subservient to the public use ; but this may be done without a violation of the public faith. Whatever the public require they are able to pay for—and it is not for the public interest that the grants of the government should be held good so long only as there is no desire to interfere with them—good while they are onerous to the grantee, and invalid when others may wish to participate in the benefits derived from them.

It is argued that the only pretended right of the plaintiffs is a promise not to give liberty to others to build a bridge ;

but we do not view it in that light. The charter of the plaintiffs contains a grant of a franchise—an incorporeal hereditament. The grant of an exclusive right is part of that franchise—granted in connexion with their right to build a bridge, and in aid of that right—holden with that right—capable of being used by the erection of a bridge elsewhere than in its present location—may be attached with the rest of the franchise, and taken on execution—and under it the plaintiffs may grant a license to build a bridge within those limits to any one who has obtained a grant of authority from the legislature to erect such bridge.

The plaintiffs have a property in their exclusive grant, and it is not a mere stipulation on the part of the legislature that no other liberty to erect a bridge shall be granted.

The plaintiffs then having an exclusive grant to the extent set forth in their bill, the next enquiry is whether the defendants, by virtue of their charter, can lawfully proceed to erect another bridge within those limits?

It is urged, that if the charter of the plaintiffs is a contract, it is subject to the implied condition of yielding to the public necessity and convenience—that if their grant be property, it may, like other property, be taken for public use; and that although no compensation is provided here, that does not make the grant to the defendants void, but the plaintiffs may have an action.

The charter of the defendants is not unconstitutional, or void. Of itself it impairs no rights. As a grant to the individuals named in it to be a corporation, it is conceded to be good. As against the public, it contains a valid grant of a right to build a bridge and to take tolls; and if the defendants can agree with the plaintiffs, we see no objection to their proceeding under their charter, and enjoying all the privileges it purports to confer.

If the charter itself was an unconstitutional act, it would be wholly void, and the defendants could not rightfully

build a bridge, and demand tolls, on purchasing of the plaintiffs a right or license to erect one within their limits, which it is admitted they might do.

But can they lawfully proceed to erect such bridge without the consent of the plaintiffs?

We are of opinion that if the charter of the defendants had made proper provision for a compensation to the plaintiffs, the legislature might have authorized the building of another bridge within their exclusive limits, even without their consent.

In such case the grant itself would furnish plenary evidence that the public interest required the taking of private property for public use; and we see no objection to taking a part of the plaintiffs' franchise.

That franchise, as we have said, is property. "No part "of a man's property shall be taken from him or applied to "public uses, without his own consent, or that of the repre- "sentative body of the people." *N. H. Bill of Rights, Art.* 12.

This has always been understood necessarily to include, as a matter of right, and as one of the first principles of justice, the further limitation, that in case his property is taken without his consent, due compensation must be provided. 1 *Black. Com.* 139; 2 *Johns. C. R.* 166, *Gardner* vs. *Village of Newburgh, and authorities there cited.*

It is not supposed here that even the consent of the representative body of the people could give authority to take the property of individual citizens for highways, bridges, ferries, and other works of internal improvement, without the assent of the owner, and without any indemnity provided by law. Such a power would be essentially tyrannical, and in contravention of other articles in the Bill of Rights.

This defence is not attempted to be supported upon any such principle.

But if adequate compensation is provided, in a proper manner, it is admitted that private property may be taken

without the special consent of the owner in each particular case.

No distinction is made in the constitution between property of one description and that of another; and if a franchise is property, we do not discover upon what ground it claims an exemption from the same liabilities to which other property is subjected.

If the government had been the owner of the land along the Piscataqua river, and had granted to the plaintiffs a tract of land co-extensive with their exclusive limits, the legislature might, afterwards, have authorized the taking of a portion of the land so granted—making provision for compensation to the grantee—notwithstanding the exclusive nature of the grant.

If, instead of a corporeal hereditament, the legislature have granted an incorporeal hereditament of such a nature that it may afterwards be necessary that the property, or a part of it, be taken for public use, why is not that subjected to the public servitude, and in the same manner? There seems to be no substantial difference between the two which requires the adoption of a different rule in this respect.

Had the legislature granted merely the right to build and maintain a bridge from point to point, and take tolls, and the public necessities afterwards required that a portion or even the whole of that bridge should be taken for other public purposes, is there any question that this might have been done, if due compensation was provided for the owners? We think not. *7 Pick.* 459, 500. Yet, as has been before stated, the grantees would most unquestionably have had an exclusive right in their bridge and tolls. Where then is the difference between a grant exclusive in its effect, and one exclusive in its terms? The latter is no more than exclusive.

If the grant had been of the "exclusive" right of building a bridge from point to point, without any extended limits, the property of the bridge when built would be no

more exclusive, nor the right more exclusive than it would be if the grant had been made without the use of the term " exclusive ;" and if the property is subject to be taken for public use in the one case it must be so in the other. If then extended limits of exclusion are added, how does that change the nature of the case ?

If the grant amounts to an extinguishment of the right of the legislature to bestow the same identical franchise upon another corporate body, and implies a contract not to reassert the right to grant the franchise to another, or to impair it, (4 *Wheat.* 658, 682,) there is the same extinguishment of the right of the grantor, and the same implied contract not to reassert that right in a grant of lands. 6 *Cranch* 137. The grantee of a fee simple takes, under a contract, an absolute estate in some respects, but subject to an implied condition or limitation, by which the lands may afterwards be taken for public use—for turnpikes, rail-roads, canals, bridges, &c., whenever the public necessities demand it ; and " a grant of franchises is not in point of principle distinguishable from a grant of any other property." 4 *Wheat.* 684.

The grant under which the plaintiffs took this property is admitted to be a contract, and that contract is inviolable. The legislature cannot annul that contract, or in any way impair its obligation. The plaintiffs have taken and received all the legislature contracted to give. It is an executed contract, (4 *Wheat.* 690,) and the plaintiffs entitled to be protected in the enjoyment of the property acquired under it, to as great an extent as they are protected in the enjoyment of any other species of property.

It does not impair that contract to hold that the property acquired under it may be taken for public use—that it is liable to be subjected to the public servitude and the public burthens. 6 *Cranch* 145, *Fletcher* vs. *Peck* ; 8 *Wheat.* 89, 101, *Green* vs. *Biddle* ; 4 *Peters S. C. R.* 563, *Providence Bank* vs. *Billings.*

<div style="float:right">Piscataqua
Bridge
*vs.*
N. H. Bridge
et als.</div>

The grant contains no covenant, in terms, that the State will never grant another bridge within those limits, nor do we think that any such covenant is to be implied, and of course no obligation to that effect is imposed. 4 *Wheat.* 197, *Sturgis* vs. *Crowninshield;* 3 *Peters* 289, *Jackson* vs. *Lamphire.*

The terms and object of the grant are satisfied without any such stipulation. The grantees have all the State professed to grant—the exclusive right. They have a property in this, and no part of it can be taken from them except for public use, and upon adequate compensation being made.

If a grant of franchises is like other grants of property, why should a covenant be implied extending the right of property in a franchise of this character beyond the rights of the holders of other property, and enabling the grantees to resist all public improvements, and deny all public wants entirely, or until such compensation as they please to demand shall be made to them ?

When the legislature shall have granted land, with a covenant that no highway, canal or rail-road shall ever be made through it—or a bridge, with a stipulation that no other bridge shall ever be erected within a certain distance, it may deserve enquiry whether such contract is within the scope of its constitutional power ?—whether the right to provide for the public necessities, and to take property for public use whenever those necessities require it, making therefor an adequate compensation, are not inherent rights of sovereignty which no legislature can part with, or control, by any stipulation, so as to bind the people, or their successors who represent the people ?

How far the case, *New-Jersey* vs. *Wilson,* 7 *Cranch* 164, may countenance the supposition that the legislature may even make a contract of that character, need not now be considered. It may be remarked that the question, whether the legislature had power to make a contract which would bind the State not to tax the lands after they came into

the possession of the citizens, does not seem to have been brought into discussion. But it must have been involved in the decision, the enquiry being whether the act of exemption was a contract.

Whether upon reconsideration the principle of that case can be supported, and if it may, whether it is to be extended beyond the decision itself, we do not enquire. 4 *Peters' S. C. R.* 561.

We conclude, then, that the legislature might lawfully authorize the taking of a portion of the plaintiffs' franchise for public use, making a just compensation; but have they done so in the present instance?

It is not pretended that the defendants' charter provides for any indemnity to the Piscataqua Bridge corporation; and the position that the defendants may take their property because the plaintiffs will have a right of action, cannot be supported.

Had the plaintiffs seen fit to suffer their property to be taken, and sought redress for the injury by action, it might have been sustained; but this is not the compensation intended by law when property is taken for public use. 2 *Johns. C. R.* 162, *Gardner* vs. *The Village of Newburgh;* 7 *Mass.* 393, *Perry* vs. *Wilson;* 1 *Pick.* 430, *Callender* vs. *Marsh;* 6 *ditto* 404, *Proprietors of Charles River Bridge* vs. *Warren Bridge.*

It is not by way of damages to be obtained in an action for an injury done that the party is entitled to be indemnified for property thus lawfully taken.

There is a *dictum* in *Stevens* vs. *The Proprietors of Middlesex Canal,* 12 *Mass. R.* 408, implying that the act of taking may be lawful, and yet an action sustained for the injury, but this evidently had not been fully considered. 1 *Pick.* 430, 435. Such a proposition may be said to be *felo de se.*

The plaintiffs have a grant of certain exclusive limits.

The defendants claim a right to erect a bridge within those limits, upon the ground that their charter gives them a right to erect such bridge, and that the plaintiffs may have compensation for the injury done to them by a suit at law. But if the defendants have a right to erect a bridge, what wrong or injury is done? If the plaintiffs might have an action on the case for the injury, which was the form in Chadwick vs. The Proprietors of Haverhill Bridge, cited in support of the position, that negatives the idea of a right. It presupposes an interference contrary to law. The legislature cannot empower any one to do a wrong—and a right to take by wrong would be a solecism. So far as the defendants may act lawfully under their charter, they will not subject themselves to an action for an injury. So far as they cannot lawfully act, they ought to refrain from acting.

Whenever lawful authority is given to take property for public use, the act of taking is justifiable. There is no injury to the rights of the party, and no action as for a *tort* can accrue. Recompense is made for what is legally taken, and the party cannot complain that a wrong is done, for his property has been taken according to the laws of the land.

It might have been sufficient, in this case, to have said that the charter of the defendants does not purport to give them any right to interfere with the property of the plaintiffs without their consent. It authorizes them to purchase real estate, and hold it in fee simple. It does not authorize the taking of any property whatever, except by agreement with the owners; and there is of course no evidence of any public necessity requiring that the property of others should be taken, except by their own consent.

The defendants, therefore, in attempting to build their bridge without the consent of the plaintiffs, cannot for this reason rely upon their charter; and we might have waived any discussion of some of the questions raised in the case; but the interest of these parties, and perhaps of others, ren-

dered it expedient for us to consider all the points which have been suggested.

It has been said that equity will not relieve against a statute. The authority cited only goes to establish the position, that equity cannot disregard the provisions of a valid law, and relieve against it. Of this there is no question. It is not pretended that we can restrain the defendants from doing a lawful act.

But if the principle was, that, sitting as a court of equity, we would not decide in this mode against the constitutionality or validity of a statute or grant, which we find no where sustained, there is nothing in the facts in this case that would bring us in conflict with such a principle.

The question is, whether we shall enjoin the defendants from doing an act under colour of their charter, which it does not authorize them to do? and we are all of opinion that the right being clear, the relief sought by the bill must be granted, and an injunction issued to restrain the defendants from building a bridge at any place within the limits of the exclusive grant to the plaintiffs, without their consent.

*Injunction issued.*