## BREWSTER *vs.* HOUGH & a.

The legislature may provide by general laws for the exemption of certain classes of property from taxation, as well as exempt it by omitting it in the description of property required to be assessed. Such exemption will be valid until the law is repealed.

The power of taxation is essentially a power of sovereignty, or eminent domain. Whether this power is not inherent in the people, under a republican government, and so far inalienable that no legislature can make a contract by which it shall be surrendered without express authority for that purpose, in the constitution, or in some other way directly from the people themselves —*quere?*

The legislature have, undoubtedly, a right, in various instances, to make grants and contracts, which will bind the state and subsequent legislatures. But there is a material difference between the right of a legislature to grant lands, or corporate powers, or money, and a right to grant away the essential attributes of sovereignty, or rights of eminent domain, which seem not to furnish the subject matter of a contract.

The Assembly and Council, under the form of government existing in 1780, appointed a committee to consider what was requisite to be done concerning the lands which were granted and conveyed to Dartmouth College; who reported, that no lands belonging to the college be sold for taxes, provided the trustees gave notice, seasonably, to the selectmen of each town respectively, what lands they had in such town; and that the taxes for the present should be charged to the state. It was resolved that the report be accepted, and that all persons take notice, and govern themselves accordingly— *Held* that this was intended only as a temporary provision, and not as a permanent exemption from taxation; and that the subsequent adoption of the constitution, and the passage of general laws under it, for the assessment and collection of taxes, terminated the operation of this resolution.

Under the statute of July 7, 1827, lands in the possession of an occupant cannot be taxed as nonresident lands.

CASE, for an illegal assessment of taxes.

The first count of the declaration alleged that the legislature of this state, on the 11th of November, 1780, by an act,

or joint resolution, exempted the land appropriated to the use of Dartmouth College from paying taxes, provided that the trustees of said college should give notice, seasonably, what lands they had in each town, respectively, to the selectmen of the town—that said act was still in force—that at the time of passing the same, and continually to the 12th of July, 1813, a certain hundred acre lot of land, in Lebanon, belonged to and was appropriated to the use of the college, and on that day was leased, by the trustees, to the plaintiff, for nine hundred and ninety years from the first of January then next, at an annual rent, reserved to the college, of $33·00—that the reversion and rent belonged still to the college—that the defendants, being selectmen and assessors of taxes, for Lebanon, on the first of April, 1835, assessed on this lot and one other belonging to the plaintiff, by the description of the Eldridge farm, taxes amounting together to $14·68, as a nonresident tax, and on the 23d day of May committed their warrant to the collector, who, under authority of the same, advertised the land for sale in the manner prescribed for the sale of nonresident lands, &c.

The second count was in substance like the first, except that the resolution of November 11th, 1780, was set forth as the grant of an exemption from paying taxes.

The third count stated, that the plaintiff resided in Hanover, and was the owner of the farm called the Eldridge farm, on which one Wood resided as his tenant, who was bound by his lease to pay the taxes, and that Wood did not refuse to give in the farm to be taxed to him ; yet the defendants taxed the same as the land of a nonresident ; and it set out the taxation, &c., as in the first count.

The fourth count alleged that Wood was tenant, as stated in the third count, and offered to be taxed for one hundred and fifty acres, part of the Eldridge farm, not leased by the college ; yet the defendants taxed the whole as nonresident land, &c.

On the trial, the plaintiff gave in evidence the following

proceedings, from the journal of the House of Representatives in 1780, viz. :

"Thursday, November 9, 1780. Voted, that Mr. Livermore, Doct. Dearborn, and Mr. Giles, with such as the honourable board shall join, be a committee to consider of what is requisite to be done concerning the lands which were granted and conveyed for the (use) of Dartmouth College, and report thereon. Sent up by Mr. Kimball.

" Friday, November 10, 1780. The committee to consider what is requisite to be done concerning the lands which were granted and conveyed for the use of Dartmouth College, report, as their opinion, that no lands belonging to the college be sold for taxes, provided the trustees of said college give notice, seasonably, to the selectmen of each town, respectively, what lands they have in such town, and that the taxes for the present should be charged to the state, which is submitted. Matthew Thornton, for the committee. Which report being read and considered—voted and resolved, that the same be received, and accepted, and that all persons take notice, and govern themselves accordingly. Sent up by Mr. Starrett."

The plaintiff also gave in evidence the following extracts from the records of the Council, viz. :

" Thursday, November 9, 1780. Vote for a committee, to join a committee of the board, to consider of the propriety of taxing lands belonging to Dartmouth College, brought up, read, and concurred ; and Mr. Thornton and Mr. Thompson joined.

" Saturday, November 11, 1780. Vote to exempt the land appropriated to the use of Dartmouth College from paying taxes, brought up, read, and concurred."

There was evidence of a vote of the proprietors of Lebanon, March 13, 1770, granting a tract of land, to be laid one mile and a half square, "for the support of Doct. Wheelock's school, on condition that said school be erected in Hanover ;" and a deed of the proprietors' clerk, May 28, 1784, in pur-

suance of said vote, and "in consideration that said Doctor Wheelock's school, incorporated with said DartmouthCollege, is erected in said Hanover," conveying the land to the trustees of Dartmouth College. Also a vote of the trustees of the college, August 26, 1772, establishing that institution at Hanover.

It further appeared that the trustees of the college, on the 12th of July, 1813, leased lot No. 6, in the mile and a half grant given to them by the proprietors of Lebanon, for nine hundred and ninety years from the first of January then next, to the plaintiff, reserving to the college an annual rent of $33·00—that the plaintiff owned an adjoining lot in Lebanon, which, together with the lot so demised, constituted the Eldridge farm ; and that the taxes were assessed on these two lots, the warrant issued, and the land advertised, &c., as alleged in the several counts of the plaintiff's declaration. No taxes were assessed on the lot thus leased, from 1830 to 1833, inclusive ; nor, so far as appeared, in any previous year ; and there was evidence that another lot, in the same grant, held under the college since 1809, had never been taxed.

On the first of April, 1835, and for four years previous, one Wood lived on the Eldridge farm aforesaid, as tenant to the plaintiff, and by the terms of his lease was bound to pay all taxes.

In April, 1835, the defendants desired Wood to give in both lots of the Eldridge farm to be taxed. He declined to give in the lot leased, on the ground that it was exempt from taxes, as being property belonging to Dartmouth College ; but offered to be taxed for the other lot, as it had been taxed before.

No proof was offered that the trustees had ever given the selectmen of Lebanon notice what land they owned in that town ; but the selectmen had knowledge of the title which the college had in the land, and of the claim made that it should be exempted from taxes.

On the 24th of August, 1835, the plaintiff tendered to two

of the defendants, and also to the collector, $9·50, as the due proportion of the tax on the land not leased by the college ; and also tendered work to pay his highway tax of $2·76.

On the foregoing case a verdict was taken for the plaintiff, by consent, subject to be amended, or set aside and judgment entered for the defendants, if the court should so direct.

*Perley*, (with whom was *Bell*,) for the plaintiff, cited 7 *Conn. R*. 335, *Osborne* vs. *Humphrey ;* 7 *Cranch R*. 164, *New Jersey* vs. *Wilson ;* 7 *Pick. R*. 108,*Hardy* vs. *Waltham ;* 11 *Johns. R*. 77, *Matter of the Mayor, &c., of New-York.*

And they contended that if the land was taxable, it should have been taxed under the statute for taxing lands in the possession of an occupant.

*E. Blaisdell, & Bartlett*, for the defendants, contended, 1. That the resolution had no validity as an exemption from taxes. 2. That the grant of the land was a conditional one, and the evidence of title in the college insufficient. 3. That the college had parted with the title, the conveyance to the plaintiff being nominally a lease, but substantially a conveyance of the land. 4. That the college gave no notice to the selectmen, what lands they owned.

PARKER, C. J. It has been contended, in this case, that the proceedings of the Assembly, in 1780, operated as a permanent exemption of this land from taxation, and deprived the legislature of the power of passing any law, afterwards, for the assessment of any tax upon it ; and several authorities have been cited in support of this position.

There is no doubt that the legislature may provide, by general laws, for the exemption of certain classes of property from taxation, as well as exempt it, in fact, by omitting it in the description of property required to be taxed. Such exemptions will be valid, until the law is repealed.

But it may well be doubted whether the Assembly of 1780, could, by any proceeding which they might adopt, make a contract, with the citizens of the state, for the permanent exemption of any portion of the property lying within the government.

The General Assembly, or General Court, as it was often called, of 1780, could have possessed no greater power, in relation to this subject, than the legislature now possesses, under the constitution. It was organized under what has been called the constitution of January 5, 1776, which was not in fact a grant of power by the people, or an instrument originally submitted to them for their sanction, but was a form of civil government adopted by a congress of representatives, elected by the inhabitants of the several towns, in pursuance of the vote of a convention, and empowered to prosecute such measures as they should deem necessary for the public good, during the term of one year. It provided for a form of government to continue during the contest with Great Britain, and was afterwards continued in force one year longer, by the vote of the people. That form of government could not, from its nature, and the present constitution does not, contain any express grant of authority, from the people, empowering the legislature to make such a contract.

The power of taxation is essentially a power of sovereignty, or eminent domain ; and it may well deserve consideration whether this power is not inherent in the people, under a republican government; and so far inalienable that no legislature can make a contract by which it shall be surrendered, without express authority for that purpose, in the constitution, or in some other way directly from the people themselves.

The leading case upon this subject is *New Jersey* vs. *Wilson*, 7 *Cranch R*. 164, in which it was held that "a legislative act, declaring that certain lands which should be purchased for the Indians should not thereafter be subject to any tax, constituted a contract which could not be rescinded by a subsequent legislative act; such repealing act being void,

under that clause of the constitution of the United States which prohibits a state from passing any law impairing the obligation of contracts." The lands had afterwards been sold by commissioners, on application of the Indians for that purpose, and at the time of the taxation were held by citizens of the state.

To that decision, based as it is upon a subject particularly within the cognizance and jurisdiction of the supreme court of the United States, we yield all due deference ; and should feel bound to follow it in a like case, could one come before us, until the tribunal which made the decision should over-rule it.

Perhaps it may well be supported, on the ground that the act was in the nature of a treaty with the Indians, which the legislature of New Jersey might, in 1758, well make with a body of them, residing within the borders of the state, but constituting a separate and distinct people, governed by their own laws.

The general rights of a legislature to surrender the power of taxing a portion of the property within the state, by a contract with some of its own citizens, in such manner as to deprive a future legislature of the right to subject such property to its proportion of the public burdens, and this without an express grant of power in the constitution, does not appear to have been considered in that case.

In *Hardy* vs. *Waltham*, 7 *Pick. R.* 108, it was held that an estate acquired by Harvard College, which was held under lease, was exempted from taxation, it having been acquired before its revenues amounted to £500 per annum. By the colonial act of 1650, which is considered as the original charter of Harvard College, taken in connection with certain previous acts, all the lands, &c., of the college, not exceeding the value of £500 per annum, were exempted from taxation. The court said: " This grant or charter was irrepealable in its nature," &c. And, again, " This original grant is expressly confirmed by the chapter of the constitution respecting Har-

Brewster *v.* Hough.

vard University, so that the legislature has not constitutional power to tax the property belonging to the institution, within the limits of the original grant. It is an immunity which is protected by the very words of the constitution."

If the constitution exempted the property from taxation, it would seem to be clear that the legislature could have no power to authorize its assessment.

A case somewhat more directly supporting the positions of the plaintiff, is that cited by the counsel from 7 *Conn. R.* 335, *Osborne* vs. *Humphrey.* A statute of Connecticut, of 1702, provided that all such lands, &c., that formerly have been, or hereafter shall be, given and granted, either by the general assembly, or any town, village, or particular person, for the maintenance of the ministry of the gospel, or school of learning, or for the relief of poor people, or for any other public and charitable use, shall forever remain and be continued to the use or uses to which such lands, &c., have been or shall be given and granted, and also be exempted out of the general list of estates, and free from the payment of rates. The lands in question had been leased for nine hundred and ninety-nine years, and buildings erected on them. It was held that this clause was repealed at the revision of the statutes in 1821, but that such repeal was inoperative as to rights already acquired by virtue of the act, being repugnant to the constitution of the United States, inasmuch as it impaired the obligation of a contract, and that the land was still exempt from taxation. A similar decision was made in *Atwater* vs. *Woodbridge*, 6 *Conn. R.* 223.

The court, in Osborne *vs.* Humphrey, cited, and relied in some measure, upon the decision in New-Jersey *vs.* Wilson; but the cases are not similar in their facts, and perhaps the difference might, on further consideration, be considered as involving one of principle. It may be remarked, moreover, that in *Providence Bank* vs. *Billings*, 4 *Peters* 561, the supreme court of the United States do not seem to consider it fully settled that a state may relinquish the power of taxation.

Mr. Chief Justice Marshall there says, " that the taxing power is of vital importance—that it is essential to the existence of the government, are truths which it cannot be necessary to reaffirm. They are acknowledged and asserted by all. It would seem that the relinquishment of such a power is never to be assumed. We will not say that a state may not relinquish it—that a consideration sufficiently valuable to induce a partial release of it, may not exist ; but as the whole community is interested in retaining it undiminished, that community has a right to insist that its abandonment ought not to be presumed, in a case in which the deliberate purpose of the state to abandon it does not appear."

Let it be distinctly understood, that we do not intend to suggest a doubt of the right of the legislature, in divers instances, to make contracts which shall bind future legislatures. We have already settled that the legislature may grant an exclusive right to erect and maintain a bridge within certain limits, and to take tolls ; and the grant was considered as a contract, which the legislature could not annul or impair. 7 *N. H. Rep.* 68, *Piscataqua Bridge* vs. *N. H. Bridge.* In that case we held, also, that the property might be taken for public use, compensation being provided. But to hold that the legislature cannot make a grant, whereby the property shall be exempted from public use ; and to hold, also, that they cannot contract to exonerate the property of the citizens from taxation, and thereby bind future legislatures ; by no means indicates an opinion that the legislature have a right to rescind or abrogate grants of land and franchises, or contracts lawfully entered into by a preceding legislature. The doctrine is well settled, that legislatures may make grants, of some kinds, which come properly within the denomination of contracts ; and such contracts, when made, are as inviolable as the contracts of an individual. Such contracts cannot be abrogated or impaired ; nor can the property in them be taken for public use, without a provision for compensation. Where an individual holds lands by the im-

mediate grant of the legislature, it is no more in the power of a succeeding legislature to abrogate and annul such grant, than it is in the power of an individual grantor to rescind his grant. And making a provision for compensation will not confer a right to revoke the grant in the former case, any more than it will in the latter. It is as essential that the public faith should be preserved inviolate, as it is that individual grants and contracts should be maintained and enforced.

But there is a material difference between the right of a legislature to grant lands, or corporate powers, or money, and a right to grant away the essential attributes of sovereignty, or rights of eminent domain. These do not seem to furnish the subject matter of a contract.

We do not, however, find it necessary to settle, in this case, how far one legislature may bind another, in relation to the power of taxation. Adopting, for the present, the position that the relinquishment of such power is never to be assumed, and that its abandonment ought not to be presumed in a case in which the deliberate purpose of the state to abandon it does not appear—we do not find in the proceedings of the Assembly, in 1780, such clear intention to grant a permanent exemption of the lands in question, from taxation, as to require us to settle the right and power so to do, if it had been attempted.

It appears, from those proceedings, that a joint committee of the House of Representatives and Council, appointed to consider what was requisite to be done concerning the lands which were granted and conveyed to Dartmouth College, reported that no lands belonging to the college be sold for taxes, provided the trustees gave notice, seasonably, to the selectmen of each town, respectively, what lands they had in such town; and that the taxes for the present should be charged to the state. It was voted and resolved that this report be accepted, and that all persons take notice, and govern themselves accordingly. This was undoubtedly intended as a vote, that what the committee recommended should be done. But

we do not find, in this, any indication of an intention to make a permanent provision, of any kind. The report of the committee, in the House, shows that it was intended to be only a provisional arrangement, and the vote of concurrence, in the Council, could not enlarge the vote of the House. If that was intended, it should have been done by amendment. But there is nothing in the vote of the Council indicating that the exemption was intended to be permanent. The vote of the House is there styled a "vote to exempt the land appropriated to the use of Dartmouth College from paying taxes." Whatever that vote was, it was read and concurred in. We must resort to the vote of the Assembly, to see what vote of exemption the Council concurred in. It does not provide that the lands should not be taxed; but only that they should not be sold for taxes, and that the taxes for the present should be charged to the state. It does not relieve the lands from assessment, but is, in effect, a provision that the taxes shall not be collected by sale, if the trustees give notice to the selectmen what lands they own; and that the taxes for the time being should be charged to the state. This contains an obvious implication that taxes were still to be assessed.

It might well be urged, moreover, that the very constitution of the General Assembly, at that time; organized as it was under a temporary form of government, would go far to show that none other than a temporary provision could have been contemplated.

But it is contended that these proceedings, if they have no greater force or operation than acts of ordinary legislation, are still in force, not having been repealed. No express repeal of them is to be found. But we are of opinion, that being, as we have seen, of a temporary character, and providing merely that the taxes on the lands owned by the college should for the present be charged to the state—when the people, in 1783, adopted a new form of goverment, authorizing the legislature to provide for the assessment and

Brewster *v.* Hough.

collection of taxes, and when the legislature exercised that power by general laws for assessments, and for the collection of all taxes assessed, in the manner provided in the acts subsequent to the adoption of the constitution—this temporary provision, for the charging of the taxes to the state, must be considered at an end.

This renders an examination of the other points suggested by the defendants unnecessary.

The constitution commends the interests of education to the fostering care of the legislature, and we doubt not they will act within the spirit of that instrument, if they exempt, by general law, the property of this college, and of all other literary institutions within the state, from taxation. But our wish that this exemption should be conferred, can furnish no reason why we should extend the rules of legal construction, for the purpose of effecting so desirable an object.

To the other ground, upon which the plaintiff attempts to sustain his action, there seems to be no answer. The statute of July 7, 1827, provides that "all personal estate, and all buildings and real estate, shall be taxed to the person claiming the same, or who is in possession or actual occupancy thereof"—"and in case no person shall be in actual possession of any house which is in the judgment of the selectmen tenantable, or any real estate improved as pasture, mowing, arable or otherwise, and the same shall not be owned by any inhabitant or resident in such town, the said house and lands shall be particularly described as aforesaid, and shall be taxed in such list, without mentioning the owner, unless he be known to the selectmen, in which case his name shall be mentioned." *N. H. Laws* 556. The land in this case was in possession of an occupant, and should have been taxed under this provision of the statute. The proceedings, for the collection of taxes on the unimproved land of nonresidents, are different from those for the collection of other taxes ; and as the selectmen were not authorized to assess this as nonresident land, the tax was erroneous, and the plaintiff is entitled to judgment on the fourth count.