## NORTHERN RAILROAD *v.* CONCORD AND CLAREMONT RAILROAD.

Under the provisions of the general railroad law of 1844, and the amendments and additions thereto, the question of the right of the road to take property for their track, may be considered upon an appeal taken from the award of damages.

In the exercise of the power of eminent domain, the track and property of one railroad may be taken for the use of another, provided the public good and interests demand it.

The report of the railroad commissioners in the laying out of a road, should contain a description of such fixed, substantial and visible monuments, from point to point, that a jury, in going upon the ground, can readily discover where the laying out is.

After an appeal, taken from the award of damages, the report of the commissioners in laying out a railroad cannot be amended so as to relate back to the time of filing the report.

The Concord and Claremont Railroad, in making their road, took a portion of the land along side the track and within the limits of the laying out of the Northern Railroad, the same having been assigned to them, as they contended, by due proceedings on the part of the road commissioners. It appeared, however, that the laying out of the Concord and Claremont road was uncertain and indefinite. An appeal was taken by the Northern road from the award of damages by the commissioners. *Held*, that the question of the right to take the property could be considered on the appeal; that, in the exercise of the power of eminent domain, the property of the appellants could be taken; but that the appellees could not, from the uncertainty of the laying out, successfully defend the taking; and that the report of the laying out could not be amended so as to relate back to the time of its being filed, and thus aid the appellees.

APPEAL, from the decision of the commissioners, assessing damages for land taken by the defendants, the appellees. The petition was dated and filed at the October term of the common pleas, 1849. It was agreed between the parties that the Northern Railroad was duly incorporated and organized; that they accepted, as part of their charter, the general railroad act, entitled an act to render railroad corporations public in certain cases, and constituting a board of railroad commissioners, approved December 25, 1844; and that pursuant to the provisions of the law, the Northern Railroad was duly laid out and the damages appraised for

land taken for the use of the corporation, for their railroad track and other necessary purposes, commencing at the Concord Railroad depot, in Concord, and terminating at the mouth of White River, in Lebanon; and that after a compliance with the provisions of the law, namely, June 2, 1847, a lease was taken from the State of New Hampshire, by said corporation, of their aforesaid railroad track, for the term of two hundred years, which lease is in form by law prescribed, duly executed, for a good consideration therein stated, recorded and filed, and in all respects in conformity with the statute requisitions.

It was also agreed that the width of the Northern Railroad track, as appraised by the commissioners and embraced in said lease, commencing on the southerly side of the free bridge road, in Concord, and extending northerly for the distance of one mile, is five rods.

It was also further agreed that the Concord and Claremont Railroad was duly chartered June session, 1848; and that said corporation, after duly adopting the general railroad law of this State, as part of their charter, and after other proceedings duly and legally had, caused all the road or track of the Northern Railroad within the limits of the Concord and Claremont Railroad, as laid out by the commissioners, from a point commencing on the southerly side of the free bridge road, so called, in Concord, and at the distance of twenty-two feet westerly of the centre of the main track of the Northern road, thence running parallel with, and at the distance of twenty-two feet from the centre of the main track of said road for the distance of two thousand two hundred and forty-six feet, thence north seventeen and three-fourths degrees west six hundred and sixty feet, where the distance from the centre of the track aforesaid is twenty-eight feet, to be appraised by the railroad commissioners and selectmen, and to be taken from the Northern Railroad and appropriated to the separate use of the Con-

cord and Claremont Railroad. This was done against the remonstrance and protest of the Northern Railroad.

The following is an extract from the report of the railroad commissioners and selectmen, laying out the Concord and Claremont road, as filed in the office of the secretary of state, August 25, 1849, so far as relates to the laying out of their road as aforesaid, northerly of the free bridge road.

" Commencing on the southerly side of the free bridge road, so called, in Concord, and at the distance of twenty-two feet westerly of the centre of the main track of the Northern Railroad, thence running parallel with and at the distance of twenty-two feet from the centre of the main track of the Northern Railroad, the distance of two thousand two hundred and forty-six feet ; thence north seventeen and three-fourths degrees west six hundred and sixty feet, where the distance from the centre of the track aforesaid is twenty-eight feet; thence on the tangents and curves, as shown in the following table."

" The width of land taken, together with the course and distance of the centre line through each lot of land, and the names of the proprietors of the same, are exhibited in the following table :

| Names of proprietors. | Course of line and radius, direction of curve. | Length in feet. | Width in rods left of centre. | Width in rods right of centre. | Remarks. |
|---|---|---|---|---|---|
| N. R. Corporation, Mary A. Stickney, B. L. Thompson, Sam'l Butterfield, Sarah Hall, Woodbridge Odlin, John Whipple, | - - - | 800 | 19½ ft. | 5½ ft. | |
| N. R. Corporation, | - - - | 1390 | 19½ ft. | 5½ ft. | |
| N. R. Corporation, Robert E. Pecker, Jona. E. Lang, Charles Smart, | N. 17¾° W. | 300 | 19½ ft. 16½ ft. | 5½ ft. 5½ ft. | At south end. At north end. |
| N. R. Corporation, | Do. | 370 | 28 ft. 32 ft. | 5½ ft. 9 ft. | At south end. At north end. |
| N. R. Corporation, Joseph B. Walker, | 955 Left. | 667 | 33 ft. 33 ft. | 9 ft. 33 ft. | At south end. At north end." |

The parties further agreed that if this court should be of opinion, upon the foregoing case, that the land or track has not been legally taken by the Concord and Claremont Railroad, and that the report of the commissioners cannot be so amended as to make the taking thereof legal and regular, then judgment should be rendered for the appellants. And if the court should otherwise decide, then the case to be remanded to the court of common pleas, for an appraisal of damages by the jury.

*Nesmith & Pike*, with whom were *George & Foster*, for the plaintiffs.

I. The action of the defendants, in assuming to take the land of the plaintiffs and awarding them damages therefor, was done against the remonstrance and protest of the plaintiffs. If the plaintiffs may have another remedy for this act of the defendants, still that does not deprive them of the right to object to the legality of the proceedings of the defendants in this case.

Such was the only course the plaintiffs could pursue, with any due regard to their rights, after the commissioners had determined to act in the premises.

The question as to whether the damages were awarded too low or not, may be the only issue of fact in the common pleas ; yet antecedent to that, and coming up with it, is the question of law, whether the commissioners can act at all in the case ; whether they have jurisdiction or not; and that question may as well be raised in this way as in any other.

II. The plaintiffs contend that the franchise of their corporation, or any part thereof, cannot be taken in the way the defendants have attempted to take it, if it can be done at all.

Prior to the passage of the act of July 2, 1838, there was no authority, in this State, for taking the franchise of a corporation for a highway. *Barber & als.* v. *Andover*, 8 N. H. Rep. 398.

By the act of 1838, the authority to take the franchise of

a corporation is limited to the selectmen and court of common pleas, and to the taking for the purpose of a new highway. The Legislature alone could confer this right, and the authority is limited to the terms of the act.

The Revised Statutes give no greater authority. Ch. 49, § 11. And a railroad does not stand on the same footing as a highway. First, because the act of 1838 was intended only to enable the selectmen and common pleas to take the franchise of corporations for highways. Such, also, is true of the provisions of the Revised Statutes. The law of 1838 was intended to meet the difficulty suggested by the court in *Barber* v. *Andover*, above cited. In that case, the public necessity for a free highway was brought in conflict with a turnpike which possessed the right to take tolls and keep a gate. In the case at bar, the defendants claim that one railroad can take the franchise of another, each having like powers and like objects.

Second, because the statute of November, 1844, chapter 128, is, as the case finds, made a part of the charter of the plaintiffs, they are entitled to all the peculiar provisions and rights which it confers. By the theory and terms of this act, the State may exercise the right of eminent domain, and take the property of its citizens for the use of a railroad. This was done in relation to the plaintiffs' road. They have such a lease as is described in the eighth section of said act, whereby the State guaranteed to the plaintiffs the right to construct a railroad over the route leased to them, with the right of user of the route for two hundred years, for their cars and engines, and all other necessary purposes of a railroad.

The executive authority of the State, in pursuance of legislative authority, have entered into a written contract, guaranteeing to the plaintiffs the right to use for two hundred years the route of the Northern Railroad. Can the defendants, in the absence of any express enactment, take from them that right or any part thereof? Is the State thus

to be made liable to an action for covenant broken ?    Shall the State be compelled to lease and guarantee the same route, the use of which they have previously leased and guaranteed ?    We think not.

The right of eminent domain had been applied to the route of the Northern Railroad before the defendants assumed to take it, and after the State had executed their lease. There had been a previous exercise of the right of eminent domain as to this route.    This sovereign right had been exercised over the very same land upon which the defendants claim again to exercise it.    This cannot be done. The power once used, has been exhausted upon the subject. *Chesapeake and Ohio Canal Co.* v. *Baltimore and Ohio Railroad Co.* 4 Gill & Johns. 155; *Maryland Mining Co.* v. *Mount Savage Iron and Coal Co.*, Railway Times.

The theory upon which private property can be taken at all is, that it be for the public use.    The right of eminent domain can only be exercised for the public use.

In the case at bar, the land had previously been dedicated to the public use, and the defendants seek to take it for no different use, certainly for none more beneficial.    It is not a claim of public necessity or benefit against private right, but the claim of one railroad to take the franchise of another, already dedicated to public use, and upon which the right and power of eminent domain has been exhausted.    This power the State may exercise itself, or it may dedicate to corporations, who can then exercise it as the agent of the State.    When the State delegates this power to a corporation, and it is exercised by the corporation, the property upon which it is exercised is then dedicated, in the eye of the law, to public use.

III.    The laying out is void for uncertainty.    It fixes no beginning or end of the land taken, nor any monument or bounds stated from which either can be determined.

The defendants have taken our road for nearly a mile in length, and there was no necessity for it whatever.    We

have a general law with reference to the connexion of railroads, which would remedy all difficulty in regard to connexion.

The Legislature gave them no power to enter upon our road.  Their charter commences at a certain point, and then runs westward.  Nearly all the acts incorporating railroads run in this way, and the Legislature could never have intended that one road should have the power to take the track of another.

*Bellows*, with whom were *Fowler* and *Baker & Peabody*, for the defendants.

This is an appeal from the award of damages by the railroad commissioners, and it goes upon the ground that the damages were too low, assuming, of course, that the commissioners acted within their jurisdiction, and that damages should have been awarded.

The only question, then, in the court of common pleas is, as to the amount of the damages.

The law of November, 1844, ch. 128, § 5, provides that the commissioners shall assess the damages, and also provides for the same right of appeal to the common pleas, and to be proceeded with in the same way and manner as is provided in section 8, chapter 51 of the Revised Statutes.  That section provides that if the owner be dissatisfied with the amount of damages awarded him by the commissioners, he may appeal to the common pleas, and the damages be awarded by the jury.  If the object, then, be to test the right of the Concord and Claremont Railroad to take the land at all, we think the appellants have mistaken their remedy.

But we go further, and contend that the appellees had a right to take the land of the appellants, as they have done. By section 11, chapter 49 of the Revised Statutes, " any real estate, franchise or easement of any corporation may be taken for a highway, in the same way and manner as the

real estate of individuals." Under a similar statute, passed July 2, 1838, it was held that the easement or franchise of a corporation might be taken for a public highway. *Pierce & als.* v. *Somersworth & als.* 10 N. H. Rep. 369; *Barber & al.* v. *Andover,* 8 N. H. Rep. 398; *Piscataqua Bridge* v. *N. H. Bridge,* 7 N. H. Rep. 35.

The power, then, to take the franchise of a corporation for a highway, may be regarded as settled in this State, and a railroad stands now upon the footing of a highway. The peculiar provisions of the law of November, 1844, ch. 128, make no difference. The right of way acquired by the corporation, by this process, is still subject to the right of eminent domain. Substantially, it is acquired by the corporation from the land owner, although through the intervention of the State. In ordinary cases the right passes by these acts, but in addition to them a lease of two hundred years is made by the State, although no conveyance, in any form, has been made to the State of the right thus leased.

It is, then, to be regarded as if the easement was acquired in the ordinary way, from the land owner. But if otherwise, and it be held that the easement is acquired from the State, it is still subject to the right of eminent domain, just as much as if the land itself had been conveyed by the State, which is, indeed, the foundation of all land titles. The case of *Backus* v. *Lebanon,* 11 N. H. Rep. 19, is decisive on this point. There, the franchise created by the act of incorporation, was held to be rightfully taken for the public use.

So in *West River Bridge Co.* v. *Dix,* 6 Howard's (U. S.) Rep. 507, it was held that the charter of a corporation is a contract between the State and the corporators, yet, like other contracts, it is subject to the right of eminent domain, and so the property and franchises may be taken for public uses, like the property of individuals.

All grantees from the State, and their assignees, hold their grants subject to the right of eminent domain. *Young*

v. *McKenzie*, 3 Kelley's (Geo.) Rep. 31. Indeed, the power of the Legislature to abridge the exercise of the right of eminent domain, has been well questioned. *Piscataqua Bridge* v. *N. H. Bridge*, 7 N. H. Rep. 69; *Brewster* v. *Hough*, 10 N. H. Rep. 138; *Backus* v. *Lebanon*, 11 N. H. Rep. 24.

At least, such a construction will not be given to a law unless the intent is clear. In this State the power of eminent domain is never exhausted, and never can be.

The only ground upon which the other side can rely is, that a railroad is not a public highway. But railroads were in operation in 1838, when the act in regard to turnpikes was passed. They have not sprung into existence since that time. And it has been settled, in more than one case, that turnpikes are public highways. *Commonwealth* v. *Williams*, 16 Pick. 175; *Newburyport Turnpike Co.* v. *Eastern Railroad*, 23 Pick. 326.

In relation to the point that the defendants had no right to take any portion of the Northern Railroad, we say, further, that it is contrary to all experience in the laying of railroads in this State.

In relation to the point that the laying out is void for uncertainty, we say that no case of such uncertainty is shown as to render the proceedings void.

EASTMAN, J. Upon an examination of the general railroad law of December, 1844, together with the various additions and amendments that have been made thereto, as found in chapter 150 of the Compiled Statutes, we are of opinion that the questions presented by this case may well enough be raised by appeal, taken in the manner in which this was.

The law contemplates a preliminary examination by the railroad commissioners in making " such a survey of the route proposed by the corporation so applying, as they shall deem necessary, with the assistance of an engineer, to be by them

selected, if, in their opinion, the same shall be necessary, which route shall be within the limits prescribed and authorized by the charter of said corporation," before the final laying out of the proposed road by the commissioners. Com. Stat. ch. 150, § 9.

If, upon such examination, the opinion of the commissioners be that the public good would not be promoted by the laying out of the road, the commissioners proceed no further in the premises, unless an appeal from their decision be taken to the governor, who, with advice of council, proceeds to consider the matter; and if, in the opinion of the executive, the public good would be promoted thereby, he will issue an order, directing the laying out of the road, to the commissioners, who thereupon proceed to lay out the same. Com. Stat. ch. 150, §§ 9, 19.

If the opinion of the commissioners is in favor of laying out the road, they so report to the governor and council; and they affirm or reject the report, according as their opinion may be, whether the public good would be promoted by the laying out or not. If the opinion of the governor and council is adverse to the laying out, the commissioners proceed no further; but if in favor, then the commissioners, on application of the corporation, proceed to lay out the road, and in conjunction with the selectmen of the town, assess the damages sustained by the owners of land, in the same way and manner as road commissioners in the several counties are now by law required to do; and the same right of appeal to the court of common pleas in the county where the lands lie, is given, as in cases of highways. Com. Stat. ch. 150 §§ 9, 10, 11.

In case the road is to be laid out, the fifteenth section of the same chapter provides that the commissioners shall, as soon as they reasonably may, make a report of all their proceedings, containing a particular description of the railroad route laid out, and their assesment of the damages awarded to the several land owners, in the same way and manner as

county commissioners are required to do, except that their report is to be made to the governor and council, and filed in the office of the Secretary of State, and is to be recorded by him in a book kept for that purpose.

The damages are also to be certified to the town clerks in the same way as road commissioners are required to do.

It thus appears that the report made upon the examination, preliminary to the laying out, involves chiefly the question whether the public good requires the road to be made; and upon this question there is the right of appeal to the governor and council, in case of an adverse report, and there is also required the confirmation of the opinion of the commissioners in case of a favorable report. But the only appeal given by the act upon the laying out of the road, is to the court of common pleas, upon the award of damages. The doings of the commissioners appear to be final, except so far as controlled by this appeal; and upon an examination of the act, and of those to which it refers, we think the court may well enough entertain the question presented by the appellants, in this form of proceeding. The commissioners have decided that certain rights and property of the plaintiffs shall be taken, and have awarded damages therefor, and from this decision the appeal is taken; and we can discover no objection, which appears to us valid, why the question may not be considered upon this appeal.

But whether the rights of the plaintiffs can be taken by the defendants, as was decided by the commissioners, is to us a much more important question, and we should add, difficult, also, were it not that the principle involved has been so fully considered in several cases in our own reports. The point which we have considered is one of practice, merely, as involving the manner in which the question of right shall be decided. But the question of right itself goes to the foundation and merits of the controversy.

Assuming that the basis upon which railroads are laid out by the commissioners is the public good—and such is

the whole theory of the act of December, 1844—and that the right of eminent domain is exercised in taking the land of individuals, against their will, for the construction of the roads; or, taking the ground that, independent of the act of 1844, railroads are so far public highways as to authorize the exercise of the right of eminent domain, as we understand was substantially decided in the case of *Greely* v. *The Concord Railroad*, in 1845, and the question of the power to take the plaintiffs' rights must be regarded as virtually settled in favor of the defendants by the authorities of our own books.

In *Backus & a.* v. *Lebanon & a.*, 11 N. H. Rep. 19, it was held that a charter, granting to certain individuals the right to organize and form a corporation, without limitation of time, with power to construct a turnpike road, take tolls, &c., does not exempt the property of the corporation, including the franchise, from the power of eminent domain, and that the property may be taken for the public use, even if the powers of the corporation are thereby suspended, or the corporation itself in fact dissolved. That the construction of a turnpike road, by a corporation chartered for that purpose, does not preclude the exercise of the power of eminent domain, in providing for a free public highway over the same ground; and that the provision in the charter by which the State reserves the right to purchase the property, after a certain period, at a certain price, will not prevent the legislature from taking the property for a public highway in the ordinary mode. In the course of the opinion, *Parker*, C. J., says: " Had the charter contained an express stipulation that the property of the corporation should never be taken in the exercise of the power of eminent domain, the question would at once have arisen, whether it was competent for any legislature to make a contract of that character; whether any legislature has authority, by contract, to lay restrictions upon this power. We have already had occasion to indicate a pretty strong impression upon that sub-

ject; and it is only necessary, at this time, to say, that we have as yet seen no reason to change the views heretofore suggested." And the very learned Chief Justice refers to the cases of *Piscataqua Bridge* v. *New Hampshire Bridge,* 7 N. H. Rep. 69; and of *Brewster* v. *Hough,* 10 N. H. Rep. 138, as the cases in which the opinion referred to was expressed.

And again : " If the legislature should grant land to an individual, in fee, with a reservation of a right, at the expiration of a term of years, to resume the property granted, upon the repayment of the purchase money, with interest, that could not be construed as implying that a public highway should not be laid through it, in the ordinary exercise of the power of eminent domain. And the principle would be the same, if the tract was of such a shape and character that the whole of it was afterwards required by the public exigencies."

In *Piscataqua Bridge* v. *New Hampshire Bridge,* 7 N. H. Rep. 67, this language is used: " Had the legislature granted merely the right to build and maintain a bridge from point to point, and take tolls, and the public necessities afterwards required that a portion, or even the whole of the bridge should be taken for other public purposes, is there any question that this might have been done, if due compensation was provided for the owners? We think not." And again : " If the government had been the owner of the land along the Piscataqua river, and had granted to the plaintiffs a tract of land co-extensive with their exclusive limits, the legislature might afterwards have authorized the taking of a portion of the land so granted, making provision for compensation to the grantee, notwithstanding the exclusive nature of the grant."

From these authorities, and the provision of the statute that any real estate, franchise or easement of any corporation, may be taken for a highway, in the same manner as the real estate of individuals, (Com. Stat. ch. 52 § 11,) it

seems clear that railroads which have adopted the act of 1844 as a part of their charter, as was the case here, being regarded as public highways, the right of eminent domain can be exercised in their favor or against them, and their property be taken, in the same manner as in the case of a turnpike corporation, a toll bridge, or a ferry. Indeed, all of the questions connected with this power, which arise in the case before us, appear to have been considered in the cases referred to.

The fact that the rights and property of one company were here taken to subserve the interests of another, does not change the principle, so long as the taking is for the public good. The tribunal who acted upon the matter were legally constituted to decide the question; and if the public interests demanded that the plaintiffs' rights should be taken, it could be done. In *Piscataqua Bridge* v. *New Hampshire Bridge,* before referred to, it was held that the legislature have power to grant an exclusive right to erect and maintain a bridge within certain limits, and to take tolls; that the grant in such case gives to the grantee a franchise ; and that the legislature cannot authorize the erection of another bridge within those limits, without provision for a compensation to the first grantee. But that such franchise is property, and that another grant to build a bridge within those limits may afterwards be made, if compensation is provided.

But notwithstanding we are of opinion that, upon the principles laid down, the defendants could take the property of the appellants, yet upon the facts before us, they cannot successfully defend against this proceeding. The report, an extract of which is embraced in the case, is altogether too uncertain to show whether the power of eminent domain has been exercised in taking the plaintiffs' property or not. The laying out is voidable, for uncertainty. It should have been marked by such definite and fixed monuments, so visible and palpable, that a jury could go upon the ground and .

Northern Railroad *v.* Concord and Claremont Railroad.

readily discover where the laying out was. The line should not only be described by tangents and curves, but there should be such substantial and permanent monuments, from point to point, as could be easily found and recognized as those set forth in the report.

Where roads have been built, and landholders have acquiesced in the taking as being the land described in the report, perhaps they could not be heard to say that the land had not been legally taken; but where the question is properly and seasonably raised, in order to make the report a valid defence it should be essentially such as we have described.

Neither does any way occur to us in which this report can be legally amended, so as to avail the defendants in these proceedings. It is not a record over which the court has any control, nor is there any statute that we are aware of, by which the amendment can be made so as to relate back to the time of the laying out.

According to these views, and the provisions of the case, there must, of course, be

*Judgment for the appellants.*